UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                      **NO: 23-131**

**DEBORAH COOPER**                              **SECTION "H"**

### ORDER AND REASONS

Before the Court are Defendant Deborah Cooper's Motion to Suppress Statements (Doc. 47) and Motion to Suppress License Plate Search (Doc. 48). For the following reasons, the Motions are **DENIED**.

### BACKGROUND

Defendant Deborah Cooper was indicted on six charges stemming from two armed robberies of Igor's Bar in New Orleans, Louisiana in February and March 2022, respectively. She is charged in Count 1 with Conspiracy to Interfere with Commerce by Robbery in violation of 18 U.S.C. § 1951(c); in Counts 2 and 4 with Interference with Commerce by Robbery in violation of 18 U.S.C. § 1951(a); in Counts 3 and 5 with Using or Carrying a Firearm during Commission of a Crime of Violence in 18 U.S.C. § 924(c)(1)(A)(ii); in Count 6 with Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2); and in Count 7 of Tampering with Proceedings in violation of 18 U.S.C. § 1512(c)(1).

1

Defendant has filed a Motion to Suppress Statements and a Motion to Suppress License Plate Reader Search, which the Government opposes. The Court held an evidentiary hearing on Defendant's motions on December 18, 2024. The Court will now consider each motion in turn.

## **LEGAL STANDARD**

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' but 'contains no provision expressly precluding the use of evidence obtained in violation of its commands.'"[1] Nonetheless, Supreme Court precedent has "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial."[2] "This rule—the exclusionary rule—is a 'prudential doctrine' . . . created by this Court 'to compel respect for the constitutional guaranty.'"[3] The purpose of the exclusionary rule is "to safeguard Fourth Amendment rights . . . through its deterrent effect."[4]

"Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of her constitutional rights."[5] When the Government

---

[1] Herring v. United States, 555 U.S. 135, 139 (2009) (quoting Arizona v. Evans, 514 U.S. 1, 10 (1995)). "It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment." United States v. Jones, 565 U.S. 400, 404 (2012) (citing United States v. Chadwick, 433 U.S. 1, 12 (1977)).

[2] *Herring*, 555 U.S. at 139.

[3] Davis v. United States, 554 U.S. 229, 236 (2011) (citations omitted).

[4] United States v. Calandra, 414 U.S. 338, 348 (1974).

[5] United States v. Guerrero–Barajas, 240 F.3d 428, 432 (5th Cir. 2001) (citing United States v. Roch, 5 F.3d 894, 897 (5th Cir. 1993)); *see also* United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).

2

performs a warrantless search or seizure, however, the burden shifts to the Government to prove by a preponderance of the evidence that the search or seizure was constitutional.[6]

## LAW AND ANALYSIS

### I. Motion to Suppress Post-Arrest Statement

In her first Motion to Suppress, Defendant moves to suppress all statements that she provided to law enforcement officers during and after her arrest on March 11, 2022. Defendant alleges that her statements and the waiver of her *Miranda* rights were involuntary because she was forcibly arrested, was intoxicated at the time of questioning, was not permitted to use the restroom, and was not given the opportunity to invoke her constitutional rights to remain silent and consult with a lawyer prior to the custodial interrogation.

In support of her Motion, Defendant provided this Court with body camera video from her arrest and a recording of her custodial interrogation. In addition, the Court heard testimony from two law enforcement officers, New Orleans Police Department Detective Charles Haw who was present at the interrogation and Bureau of Alcohol, Tobacco, Firearms, and Explosives Task Force Officer Matthew Bencik, who was present at both the arrest and interrogation. In consideration of this evidence, the Court makes the following findings of fact.

---

[6] United States v. McKinnon, 681 F.3d 203, 207 (5th Cir. 2012) (citing *Guerrero–Barajas*, 240 F.3d at 428).

3

On the morning of March 11, 2022, officers located Defendant under a pile of clothing inside a home during the execution of a search warrant. Officers had weapons drawn while searching the home and initially pointed a weapon at Defendant before securing her. During her arrest, which took place at approximately 7:00a.m., Defendant told officers on at least two occasions that she was drunk or that she had been drinking the night before. She tripped on items on the floor of the home while exiting. Defendant entered the interrogation room at approximately 7:45a.m. Defendant requested to use the restroom but was told that a female officer needed to escort her. Defendant then appeared to fall asleep with her head on the table. At 8:25a.m., Defendant told an officer that she was "a little tipsy" while she was being led out of the room. Upon returning, Defendant laid her head back down on the table and appeared to go to sleep. At 9:32a.m., Detective Haw and Officer Bencik entered the interrogation room to question Defendant. Defendant appeared alert and responsive during the questioning and gave detailed, relevant answers to the officers' questions. Both officers testified that they did not notice any obvious signs of intoxication, that Defendant did not say she was intoxicated, and that she appeared to understand her rights and their questions. Detective Haw gave Defendant her *Miranda* rights from memory and asked her to sign an acknowledgement of her rights. Detective Haw did not follow NOPD protocol in giving Defendant her rights because he failed to ask Defendant whether she wished to speak with him prior to proceeding with questioning. However, Defendant did not ask any questions regarding her rights, orally indicated her understanding of them, signed the acknowledgement form, and then answered the officers' questions. The officers questioned Defendant for approximately 30

4

minutes. Throughout the course of her 2.5-hour detention, Defendant asked to use the restroom on four occasions but was not taken to use the restroom.

Under *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[7] "*Miranda* warnings must be administered prior to custodial interrogation."[8] "Once adequate warnings have been given, a suspect may knowingly and intelligently waive his *Miranda* rights and agree to answer questions."[9]

> The inquiry whether a valid waiver has occurred "has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." When the prosecution offers statements made by a defendant during custodial interrogation, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."[10]

The Government need "prove waiver only by a preponderance of the evidence."[11]

---

[7] United States v. Cardenas, 410 F.3d 287, 292 (5th Cir. 2005) (discussing Miranda v. Arizona, 384 U.S. 436 (1966)).

[8] United States v. Lim, 897 F.3d 673, 690 (5th Cir. 2018).

[9] *Cardenas*, 410 F.3d at 292.

[10] United States v. Andrews, 22 F.3d 1328, 1337–38 (5th Cir. 1994) (internal citations omitted).

[11] Colorado v. Connelly, 479 U.S. 157, 168 (1986).

In considering the voluntariness of a statement, the court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."[12] "To be voluntary, a confession must be the product of a rational intellect and free will."[13] "A confession is involuntary if the defendant is so intoxicated by alcohol or other drugs that the confession is not rationally and freely given."[14] "The mere fact that the defendant had taken drugs prior to giving the statement does not render it inadmissible. The evidence must show the defendant was so affected [by drugs or alcohol] as to make his statement, after appropriate warnings, unreliable or involuntary."[15] In considering this, the Fifth Circuit advises the Court to consider "whether a defendant showed signs of intoxication, cooperativeness and alertness during questioning, the amount of detail in a defendant's answer, whether the officers believed the defendant to be aware and reasonable during questioning, whether defendant indicated that he understood his *Miranda* rights, and whether defendant responded affirmatively to questions regarding his understanding of his rights."[16]

Considering the totality of the circumstances, the Court finds that Defendant's statements were voluntarily given and that she voluntarily waived her rights. Defendant did not appear obviously intoxicated either to

---

[12] Decloues v. Cain, No. CV 14-1158, 2019 WL 13249454, at *7 (E.D. La. Mar. 8, 2019), report and recommendation adopted, No. CV 14-1158, 2019 WL 11767760 (E.D. La. May 30, 2019)

[13] United States v. Kreczmer, 636 F.2d 108, 110 (5th Cir. 1981).

[14] *Id.*

[15] United States v. Taylor, 508 F.2d 761, 763 (5th Cir. 1975).

[16] United States v. Scott, No. CR 19-00068-BAJ-RLB, 2019 WL 5783419, at *3 (M.D. La. Nov. 6, 2019).

this Court or to the officers questioning her. She appeared to understand the officers' questions and gave relevant and coherent answers thereto. She indicated that she understood her *Miranda* rights and signed acknowledging such. Further, the questioning did not begin for 2.5 hours after she was taken into custody, allowing the effects of any alcohol she may have consumed before her arrest to diminish.[17] The Court therefore does not find that she was "so affected" by alcohol to make her statement involuntary.[18]

Next, the Court finds that Defendant was properly informed of her *Miranda* rights and knowingly and voluntarily waived those rights. The law does not require verbatim recitation of the *Miranda* rights.[19] Rather, "the admissibility in evidence of any statement given during custodial interrogation of a suspect" depends on the issuance of four warnings: "a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he

---

[17] "[A]s a result of the human body's natural metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated." Missouri v. McNeely, 569 U.S. 141 (2013).

[18] *See* United States v. Solis, 299 F.3d 420, 440 (5th Cir. 2002) ("The district court also viewed portions of the videotape itself. It then found that: the interview took place one hour after arrest; Jose Meza was informed of the charges and read a Miranda warning; no coercion was used and no promises were made; and Jose Meza looked alert on the videotape, was lucid and responsive, was quite articulate talking to Meeks and answering Meeks's questions, and appeared to be understanding the conversation, despite occasionally yawning and scratching himself. On the strength of these findings, which we conclude were not clearly erroneous, we conclude that the government proved, by a preponderance of the evidence, that Jose Meza voluntarily confessed and validly waived his Fifth Amendment rights following a Miranda warning.").

[19] California v. Prysock, 453 U.S. 355, 359 (1981) ("Miranda itself indicated that no talismanic incantation was required to satisfy its strictures.").

7

so desires."[20] Defendant was issued these warnings and verbally indicated her understanding. Detective Haw's failure to ask Defendant whether she wanted to speak with him or otherwise pause to allow her an opportunity to invoke her rights does not render the waiver of her *Miranda* rights involuntary. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."[21]

Finally, Defendant does not cite to any case or give any analysis for how law enforcement's "forcible arrest" or delay in allowing Defendant to use the restroom render her statements involuntary. Accordingly, the Court finds that the Government has carried its burden to show that Defendant's statements were voluntary and that she knowingly and voluntarily waived her *Miranda* rights prior to making those statements.

## II. Motion to Suppress Automated License Plate Reader Search

Defendant next moves to suppress all evidence obtained by law enforcement officers as a result of their warrantless Automated License Plate Reader (ALPR) search. Defendant argues that a search of the ALPR data for her license plate number was akin to a search of historical cell-site location information, which the Supreme Court held in *Carpenter v. United States* required a search warrant.[22]

In *Carpenter*, the Government sought cell-site location information (CSLI) for the Defendant's cell phone "at call origination and at call

---

[20] Dickerson v. United States, 530 U.S. 428, 435 (2000).
[21] Berghuis v. Thompkins, 560 U.S. 370, 384 (2010).
[22] 585 U.S. 296 (2018).

8

termination for incoming and outgoing calls during the four-month period when the string of robberies occurred" from two wireless carriers.[23] "Altogether the Government obtained 12,898 location points cataloging Carpenter's movements—an average of 101 data points per day."[24] The Supreme Court considered whether the Government should have obtained a warrant supported by probable cause prior to searching the defendant's historical CSLI.

      The Court considered Fourth Amendment precedent regarding GPS tracking and precedent regarding information a person voluntarily turns over to a third person. It noted that "much like GPS tracking of a vehicle, cell phone location information is detailed, encyclopedic, and effortlessly compiled."[25] But also noted that, "the fact that the individual continuously reveals his location to his wireless carrier implicates the third-party principle" as well.[26] In balancing these two lines of cases, the Court ultimately held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI."[27] It held that allowing access to CSLI data contravenes "society's expectation . . . that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period."[28] "Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. As with GPS information, the time-stamped data provides an intimate window

---

[23] *Id.* at 302.
[24] *Id.*
[25] *Id.* at 309.
[26] *Id.*
[27] *Id.* at 310.
[28] *Id.*

into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations."[29]

> Moreover, the retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection. With access to CSLI, the Government can now travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers, which currently maintain records for up to five years. . . . Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years, and the police may—in the Government's view—call upon the results of that surveillance without regard to the constraints of the Fourth Amendment. Only the few without cell phones could escape this tireless and absolute surveillance.[30]

The Court concluded: "In light of the deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection, the fact that such information is gathered by a third party does not make it any less deserving of Fourth Amendment protection."[31]

Defendant compares the data captured and stored by the ALPR system to CSLI. She argues that the same factors present in *Carpenter* apply here: (1) the enhanced ability of technology to surveil; (2) the indiscriminate nature of the surveillance, and (3) the retrospective quality of the technology and its ability to retain information and re-create a person's movements going back months. The Government responds that the data obtained by the ALPR is not akin to the "detailed, encyclopedic" CSLI data at issue in *Carpenter*. It argues

---

[29] *Id.* (internal quotations omitted).
[30] *Id.* at 312.
[31] *Id.* at 320.

10

that the data from the ALPR is brief and limited and does not capture information that is not available to the naked eye. It contends that Defendant has no reasonable expectation of privacy in her license plate or in the limited account of her travel provided by the ALPR database.

Ultimately, resolution of this issue focuses on "the extent to which a substantial picture of the defendant's public movements are revealed by the surveillance" from the ALPR.[32] The Court held an evidentiary hearing on Defendant's Motion and heard testimony from Ross Bourgeois, Director of Public Safety Support Services for the City of New Orleans, and Bureau of Alcohol, Tobacco, Firearms, and Explosives Task Force Officer Matthew Bencik. Based on the evidence introduced at that hearing, the Court makes the following findings of fact.

In investigating the robberies of Igor's Bar, officers identified a unique two-toned Dodge Ram used by the suspects in the robbery. Officer Bencik testified that he searched for Dodge Rams in the NOPD Field Interview Card system of vehicles previously involved in traffic stops and compared them with reads from the ALPR system. In doing so, he was able to locate a Dodge Ram that had been stopped in November 2021 and by cross-referencing the ALPR database, he observed pictures of the Dodge Ram that matched the unique characteristics of the vehicle seen leaving the robberies. By inputting the license plate of the Dodge Ram into the ALPR, he was able to observe historical reads that captured the vehicle traveling throughout New Orleans before and after the robberies. However, there was no ALPR data that put the vehicle at

---

[32] Commonwealth v. McCarthy, 142 N.E.3d 1090, 1104 (2020).

the scene of the robbery. Officer Bencik was able to connect Defendant to the vehicle using information from the November 2021 traffic stop. Officers included the fact that the ALPR revealed the vehicle traveling around New Orleans before and after the robbery in the affidavits supporting search warrants of Defendant's vehicle and residence, as well as an arrest warrant.

At the time of the search of the ALPR database at issue here, New Orleans had approximately 60 ALPR cameras in use throughout the city. ALPRs are high-tech cameras that automatically take photos of the rear of every passing vehicle and converts the license plate number to a searchable format. They capture license plate numbers, time and geographic location, and a still image of each vehicle. It is possible that the occupants of the vehicle may be visible through the back window in the image collected by the ALPR. In 2022, this information was stored in a searchable database for 180 days.

In light of these findings of fact, the Court finds that the ALPR data at issue here is not comparable to CSLI data, and the reasoning of *Carpenter* does not extend to searches thereof. "Unlike the all-pervasive cell-site location data collection in *Carpenter*, and its 'all-encompassing' and 'near-perfect surveillance' of a cell phone user's comings and goings, the ALPR technology at issue captures only the public movements of vehicles that happen to pass by locations on a public street in view of an ALPR camera."[33] With only 60 cameras operating throughout the city, the data collected by the ALPR system is far more limited than CSLI. A person must actively pass by one of the cameras for any data to be collected and even then, only a small amount of

---

[33] United States v. Bowers, No. 2:18-CR-00292-DWA, 2021 WL 4775977, at *3 (W.D. Pa. Oct. 11, 2021).

information is collected and retained. Individual snapshots in certain locations at specific times "hardly rise to the level of persistent, unceasing public surveillance that the courts found troublesome in *Carpenter*."[34] Further, the Court in *Carpenter* distinguished cell phones from cars, noting that "[w]hile individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time."[35] Other district courts considering this issue have reached the same conclusion, holding that the data gleaned from the ALPR database does not rise to the level of CSLI data and does not implicate the concerns raised in *Carpenter*.[36] "[C]ourts have held that law enforcement's use of the ALPR database does not infringe upon an individual's reasonable expectation of privacy because it does not reveal intimate details of an individual's daily life, nor does it track a person's every movement."[37]

The facts at issue here are more akin to the warrantless tracking of a discrete automotive journey that the Supreme Court deemed permissible in *United States v. Knott*.[38] There, the Court considered the Government's use of a "beeper" to aid in tracking a vehicle through traffic. The Court held that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."[39] It noted

---

[34] United States v. Martin, No. 3:23-CR-150, 2024 WL 4476560, at *13 (E.D. Va. Oct. 11, 2024).

[35] *Carpenter*, 585 U.S. at 311.

[36] *Martin*, 2024 WL 4476560, at *13; United States v. Jiles, No. 8:23-CR-98, 2024 WL 891956, at *18 (D. Neb. Feb. 29, 2024); United States v. Graham, No. CR 21-645 (WJM), 2022 WL 4132488, at *5 (D.N.J. Sept. 12, 2022); USA v. Rubin, 556 F. Supp. 3d 1123, 1129–30 (N.D. Cal. 2021); *Bowers*, 2021 WL 4775977, at *3.

[37] *Graham*, 2022 WL 4132488, at *5.

[38] 460 U.S. 276 (1983).

[39] *Id.* at 281.

that the defendant "voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property."[40] The Court noted that "[v]isual surveillance from public places" would have "sufficed to reveal" all of the same facts to the police and that the Fourth Amendment did not prohibit the police from using technology to augment their visual surveillance.[41]

Here too, the police could have observed Defendant driving around New Orleans before and after the robbery through visual surveillance. Defendant drove on public streets such that "anyone who wanted to look" could have observed her movements.[42] The ALPR cameras "merely augment the same sensory faculties" that have always been used by law enforcement.[43] The facts in the record simply do not support a reasonable expectation of privacy in Defendant's movements within the reasoning of *Carpenter*. Accordingly, Defendant has not shown that her Fourth Amendment rights were violated by the Government's warrantless ALPR search of her license plate number.

---

[40] *Id.* at 281–82.
[41] *Id.* at 282.
[42] *Id.* at 281–82.
[43] *Martin*, 2024 WL 4476560, at *16.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motions are **DENIED**.

New Orleans, Louisiana this 6th day of January, 2025.

_____
**JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE**